Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KRISTIE B. and B.B.,<br><br>        Plaintiffs,<br><br>vs.<br><br>BLUE CROSS BLUE SHIELD<br>of KANSAS CITY,<br><br>        Defendant. | COMPLAINT |

Plaintiffs Kristie B. ("Kristie") and B.B., through their undersigned counsel, complain and allege against Defendant Blue Cross Blue Shield of Kansas City ("BCBSKC") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Kristie and B.B. are natural persons residing in Johnson County, Kansas. Kristie is B.B.'s mother.

2. BCBSKC is an independent licensee of the nationwide Blue Cross and Blue Shield network of providers and was the insurer and claims administrator, as well as the

fiduciary, under ERISA for the insurance plan providing coverage for the plaintiffs ("the Plan") during the treatment at issue in this case.

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Kristie was a participant in the Plan and B.B. was a beneficiary of the Plan at all relevant times. Kristie and B.B. continue to be participants and beneficiaries of the Plan.

4. The Plan documents tell Plan participants and beneficiaries that BCBSKC was the entity to which they were to submit claims, request documents and other information, and otherwise communicate about their benefits under the Plan.

5. B.B. received medical care and treatment at Trails Carolina ("Trails") from June 4, 2020, to September 2, 2020, Solacium Sunrise ("Sunrise") from September 3, 2020, to December 18, 2020, Outback Therapeutic Expeditions ("Outback") from December 18, 2020, through February 18, 2021, and Eva Carlston Academy ("ECA") from February 19, 2021, through August 5, 2021.

6. These are treatment facilities located in North Carolina and Utah which, during the timeframe at issue in this case, provided sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

7. BCBSKC, acting in its own capacity or through its affiliate New Directions Behavioral Health ("New Directions"), denied claims for payment of B.B.'s medical expenses in connection with her treatment at Trails, Sunrise, Outback, and ECA, as well as B.B.'s medically necessary crisis transportation provided by Right Direction Crisis Intervention.

8. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

9.  Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because BCBSKC does business in Utah through its network of affiliates, and a significant degree of the treatment at issue took place in Utah.

10. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### B.B.'s Developmental History and Medical Background

11. B.B. started exhibited concerning behaviors from a very young age. She was diagnosed with ADHD in the second grade and attempted numerous medications, none of which were effective. Around the time that she was in the fourth grade she began to exhibit significant anxiety, particularly at school.

12. B.B. expressed paranoid thoughts that someone was going to "get her" while she was home. When she was in the sixth grade, B.B. had a very negative reaction to one of her medications. She started meeting with a therapist and confessed to experiencing significant depression and suicidal thoughts.

13. B.B. was frequently very agitated and withdrawn. She started lying about many things and avoiding school. She told her therapist that she felt "anxious about everything and all day."

14. B.B. met with a psychiatrist and was diagnosed with an anxiety disorder. She was also found to have a gene mutation which interfered with her body's dopamine and serotonin production and interfered with her ADHD medications.

15. B.B.'s behaviors became increasingly erratic. She would steal from others, destroyed property, threatened to run away from home, and on one occasion, opened the car door and ran off after a fight about schoolwork. During this time frame she got into a fight with a classmate on a field trip and started rolling on the floor crying and kicking the walls.

16. B.B. was very socially oriented but began to lose all her friends after sending them multiple hostile messages, after which her former friends started excluding her. In October of 2019, B.B. spray painted obscenities all over the walls of her room. She continued trialing multiple medications, but they were still largely ineffective.

17. After receiving a video from a boy in her class saying "Everyone hates you, we don't want you here, you have no friends" B.B. was caught writing a suicide note. She was pulled out of school and homeschooled until she could start going to a new school.

18.  B.B. made new friends at her new school, but also started abusing alcohol and other drugs with them. After buying drugs from a particularly dangerous Kansas City neighborhood, she was confronted by her parents and threw a heavy object through a window. B.B. restricted her food intake and would binge and purge at times as well.

19. On one occasion around this time, B.B. was sexually assaulted while using drugs with an acquaintance she barely knew. She was also "unaccepted" from her high school due to her behaviors.

20. B.B.'s drug use escalated during the Covid 19 pandemic and she would often act out aggressively and attack others (at times causing severe bruising requiring medical attention) or destroy things. B.B. started attending an outpatient Dialectical Behavioral Therapy program. She completed the program, but her behaviors did not improve and she was admitted to Trails.

**Trails**

21. B.B. was admitted to Trails on June 4, 2020, via a crisis transportation service. BCBSKC denied payment for both the treatment and the crisis transportation.

22. In an Explanation of Benefits statement dated September 23, 2021, BCBSKC denied payment for B.B.'s treatment under code TR0- "This service is not covered under the plan."

23. On March 4, 2022, Kristie submitted an appeal of the denial of payment for B.B.'s treatment. Kristie wrote that she was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information she provided, and which gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave her the information necessary to perfect the claim.

24. She asked that the reviewers be knowledgeable about generally accepted standards and clinical best practices for outdoor behavioral health programs in North Carolina as well as trained in the details of MHPAEA to meaningfully respond to her allegations concerning a violation of the statute.

25. Kristie noted that the exclusions section of her benefits booklet was particularly comprehensive and listed services as varied as remedial reading, work hardening programs, extracorporeal shock wave therapy, acupuncture, and speech therapy, as excluded, yet no exclusion for outdoor behavioral health services was listed.

26. She pointed out that Trails was a licensed and accredited outdoor behavioral health provider. She asked BCBSKC to elaborate on what basis it had denied payment given the lack of any written exclusion in the terms of the Plan for these services.

27. Kristie expressed concern that BCBSKC's denial was a violation of MHPAEA. She wrote that MHPAEA compelled insurers to ensure that coverage for behavioral health services was offered at parity with coverage for analogous medical or surgical services. She identified skilled nursing, subacute rehabilitation, and inpatient hospice care as some of the medical or surgical analogues to the treatment B.B. received at Trails.

28. Kristie wrote that by refusing to pay for treatment at Trails despite no exclusion existing in the plan terms, BCBSKC appeared to be imposing a limitation based on facility type in violation of MHPAEA. She asked BCBSKC to perform a MHPAEA analysis to assess the Plan's level of compliance with the statute and asked to be provided with physical copies of the results of this analysis.

29. In addition Kristie asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions

regarding the claim from any physician or other professional, along with their names,

qualifications, and denial rates (collectively the "Plan Documents").

30. In a letter dated May 22, 2022, BCBSKC upheld the denial of payment for B.B.'s

treatment. The letter stated that no benefits were available for services which were not

specifically covered under the contract and that contractual exclusions would not be

evaluated for medical necessity. The letter further stated that Trails was located outside of

the BCBSKC service area which meant the member was responsible for obtaining

preauthorization before seeking care. The letter then stated that MHPAEA was not

applicable as wilderness services were not covered under the Plan.

**Sunrise**

31. B.B. was admitted to Sunrise on September 3, 2020.

32. In a letter dated September 8, 2020, New Directions denied payment for B.B.'s treatment

at Sunrise. The letter gave the following justification for the denial:

> We were unable to obtain from your provider the information necessary to
> approve the level of care requested. After reviewing New Directions' medical
> necessity coverage criteria for Psychiatric Residential Criteria that takes into
> account age, progress of treatment, diagnosis and other programs available, we
> have determined your care can be provided in a less intensive level of care such as
> Psychiatric Intensive Outpatient:
>
> Solacium Sunrise has asked for approval to provide care for you. You sought
> treatment to get help with your mood. Your care team reports that you are able to
> function day to day. You do not have a medical condition that requires this level
> of care. You are not thinking about harming anyone. You do not require 24 hour
> care to keep safe. You are not at high risk to be hospitalized. Please follow up
> with your care team for the next steps in your care.

33. On March 22, 2021, Kristie submitted an appeal of the denial of payment for B.B.'s

treatment at Sunrise. She encouraged the reviewer to carefully review all the information

she included and reminded BCBSKC that it had a fiduciary duty to act in accordance
with her best interests.

34. She stated that she had requested a copy of B.B.'s case notes on three separate occasions
but had yet to receive them. She questioned how she was expected to adequately appeal
the denial when all she had to go on was the vague language New Directions had
provided in its denial letter.

35. She pointed out that B.B. was discovered to be self-harming with a piece of glass while in
treatment and had been placed on safety status due to problematic behaviors such as
"tattooing" herself with a safety pin and threatening to run away.

36. She pointed out that B.B.'s presentation was so bad that she was deemed unable to
complete the program at Sunrise and was subsequently taken to Outback.

37. Kristie included letters of medical necessity with the appeal. In a letter dated November
10, 2020, Julie Harkleroad, MS, LCMFT, wrote in part: (emphasis in original)

> I have treated [B.B.] and her family since June 2019. It was upon my
> recommendation and the recommendations of her psychiatrist as well as
> professional consults with other clinicians and [B.B.]'s school that the [B.] family
> made the difficult decision to send [B.B.] for intensive inpatient treatment
> beginning in the late spring/early summer of 2020. This decision was not made
> lightly. It was discussed, analyzed and re-evaluated many times. Only when it
> became evident that without this kind of 24 hour care, [B.B.] risked juvenile
> delinquency, risky sexual behavior that could have led to a sexually transmitted
> disease or pregnancy and/or running away from home or being human trafficked,
> that we collectively decided that this was the only method of keeping [B.B.] safe.

> I understand from the [B.] family that their insurance provider and managed
> behavioral health care provider are denying [B.B.]'s medical claim for inpatient
> treatment. Not only am I shocked at this decision, but I am also disgusted by it.
> What DOES it take to get coverage for inpatient care?...

> A few highlights of the most damaging and risky behavior that was never able to
> be controlled includes:

> **Breaking plateware and glassware in her kitchen in front of her parents**

**Spray painting obscenities on her bedroom wall and refusing to clean it or repair it**

**Attempts to break down doors in her home**

**Sneaking out in the middle of the night to purchase marijuana and alcohol and then consuming it**

**Posting threats against other students online**

**Rapid weight gain - [B.B.] gained over 20 pounds in less than a year**

**School refusal. (Not once in a while or just verbal complaints but full out physical refusal to get up and go to school, complete schoolwork or communicate at all with school staff)**

**Refusal to return to psychotherapy**

It was at this point that I recommended consultation with a placement company because I believed if we did nothing more [B.B.] would end up running away from home at best. It was life or death, and I did not want to take that risk.

I noticed in the denial letter that the [B. family's] claim was denied because it was determined that "care could be provided in a less intensive level of care such as an intensive outpatient facility". Please note - this was done. The Lilac Center used Dialectical Behavioral Therapy with [B.B.]. [B.B.] did participate in outpatient support. It failed.

I also noticed that the denial letter stated that [B.B.] was "able to function day to day and there is no medical condition that requires inpatient care...that she was not at high risk to be hospitalized". What medical condition are you waiting for? Are you claiming that trauma, learning disorders, neurocognitive delays, abuse of drugs and alcohol and depression are not medical conditions that could require inpatient care? This is a completely erroneous and flat out dangerous claim. Not only was [B.B.] not able to function in school or at home but she was no longer a contributing member of society. She had literally stopped participating in *EVERY SINGLE* part of her life. How can you claim that she was "functional"? Are you waiting for her to be catatonic or make an attempt on her life before you permit her 24 hour treatment? Do you not agree that depression, suicidal ideation, risky sexual behavior, risky drug experimentation and lack of any social engagement whatsoever is in itself high risk behavior, unsafe and life threatening for any person but most especially for a child?

It is critical to note that [B.B.] *DID* make progress in residential treatment over the summer. She was drug free, had developed friendships, was taking care of her

own hygiene, was participating in therapy, became a leader and held a regular sleep schedule all while in treatment. That was not happening at home. …

Given the persistence of [B.B.]'s symptoms and the level of risk associated with those symptoms, it was my clinical recommendation that inpatient care was medically necessary for [B.B.]. I felt so strongly about this that had her parents chosen to do nothing and not taken this next step, I would have felt compelled to report her parents to Kansas Child Protective Services. I do not play around or take risky gambles with the lives of children.

38. Christopher Van Horn, DO, wrote in part in a letter dated February 16, 2021:

On 01/24/2020, [B.B.]'s parents notified me that she became extremely, physically aggressive at home after her parents found a bag of marijuana in her room. During this altercation, she threatened to kill her father, and threatened to kill herself. She had begun having increasing absences from school, refusing to go, refusing to adhere to any parental structure. She became increasingly threatening towards herself and her parents anytime they tried to impose any sort of structure or limitation. It appeared that the stimulant medication had been exacerbating this irritability. Therefore, it was discontinued. She was seen again on 03/26/2020, and on 05/08/2020. By the May appointment, she was completely refusing to adhere to any sort of structure. She was having repeated anger outbursts. She was doing DBT at the Lilac Center in addition to individual therapy with her private therapist, but despite intensive intervention she was not improved. Her parents continued to find more evidence of drug abuse and peer problems. She was also starting to encourage her younger sister to act out in these ways. Although her behaviors did not meet criteria for acute suicidality or homicidality, clearly, despite extensive treatment efforts, [B.B.] continued to deteriorate to the point where she was no longer safe to remain at home, and was not safe to function outside of a structured therapeutic setting.

It was my medical recommendation that [B.B.]'s family pursue residential treatment. She was placed at a facility upon my recommendation on 09/03/2020, which I fully believe is medically necessary. Specifically, she had failed response to outpatient medication management with myself and one other psychiatrist. She had failed response to individual therapy with three prior therapist, [sic] to family therapy, and to dialectical behavior therapy. [B.B.] was engaging in behavior that was clearly self-destructive and self- endangering. [B.B.] was not acutely hospitalized, as she did not meet acute inpatient criteria for imminent self-harm. However, undoubtedly, outside of a structured therapeutic program, she would have continued to deteriorate. Having worked in this region for the last 20 years, both in inpatient psychiatric care, managing an IOP, and in outpatient private practice, I am confident that I have expertise in these areas. Her treatment in a residential treatment facility was absolutely within the standard of care. Failing to provide [B.B.] with residential treatment would be neglectful, and endangering to her well being both short and long-term.

39. Trisha Robinson, MA, LPC, wrote in part in a letter dated January 5, 2021:

> [D]espite all of these extensive efforts to make gains in [B.B.]'s mental health her symptoms have become increasingly more complex and increasing in severity. In addition, [B.B.]'s symptoms and struggles are affecting almost every area of her day-to-day functioning. She was unable to stay in the classroom setting, refusing therapy, struggles with having appropriate and safe peer relationships. Progress is minimal and slow. In the evidence provided here, it is clear that [B.B.] has needed these higher levels of care due to the significant complexities of her mental health. With the numerous telephonic conferences & meetings with [B.B.]'s parents and the Trails Treatment team, Sunrise Treatment Team, [B.B.]'s previous providers and also review of [B.B.]'s psychological evaluation and school records, I concur. Meaning there is beyond substantially indicated rationale for [B.B.] to receive long-term, residential mental health care in order to establish safety both physically and emotionally before she can return home.

40. Jessica Stenquist, MPA, LCSW, wrote in part in a letter dated March 5, 2021:

> [B.B.] required next step placement directly from Outback to an appropriate Residential Treatment Center that would provide intense therapeutic treatment and adult supervision 24 hours a day, 7 days a week. This gives her with [sic] the support she needs to continue learning to successfully regulate her emotions and apply the tools she has started obtaining within a wilderness therapy setting. If [B.B.] were to return home the risk for relapse with behaviors and emotional overload was significant. As stated earlier, the levels of care that were used prior to Outback were not sufficient to interrupt the cycle. The level of scaffolding provided at a therapeutically sophisticated residential treatment program was needed to help continue and maintain the skills [B.B.] acquired at Outback. A residential treatment program will help [B.B.] continue to address the issues identified above through continued therapy while also allowing her to catch up with the discrepancies in her academics and continue her work towards obtaining a High School Diploma. This setting would offer [B.B.] with the scaffolding she needs to help her be prepared to move on to the next step after her completion.

41. Anna Edwards, Ph.D, wrote in part in a Comprehensive Neuropsychological Evaluation

    dated July 16 2020: (emphasis in original)

> [B.B.] meets criteria for a diagnosis of an **Oppositional Defiant Disorder.** Moreover, at the present time, there is an emerging pattern of instability in [B.B.]'s interpersonal relationships, self-image, impulsive behavior, and emotions. These characteristics are particularly notable in her poorly regulated emotional states, limited emotional connection at times, self-devaluation, dishonesty, and self-destructive behaviors. She appears to have significant difficulty regulating her emotions and tolerating distress. However, it is difficult to disentangle the effects of environmental and stress related variables. Still,

intensive treatment is important to thwart or interrupt further development of dysfunctional coping strategies, more serious rule breaking behaviors, or unproductive personality traits as [B.B.]'s parents and treatment providers offer her support, education, and mental health services designed to promote her sense of autonomy, self-worth, the development of health [sic] coping skills, and social competence. A description of a Parent-Child Relational Problem is also merited to note family relationships as an ongoing area for future intervention and treatment. …

Following her placement at Trails, it is highly recommended that [B.B.] continue in a structured therapeutic residential setting such as a clinically sophisticated Therapeutic Boarding School or residential treatment center. Outside of this type of structure, [B.B.] is at high risk to experience further declines in functioning. She is at-risk of substance abuse and other self-destructive behaviors. In a setting with less support, progress could be hindered by her therapist's lack of objective data (e.g., examples from daily routines that show if she is using skills discussed in therapy) and continued reinforcement of maladaptive behaviors and negative cognitions outside of the office setting. [B.B.] seems to have the best chance of breaking out of her current negative patterns if she is able to be immersed in a highly structured and supportive therapeutic program with a positive peer culture where she can begin to develop a more positive sense of identity, increase feelings of self-efficacy, stabilize emotionally and behaviorally, and learn to cope in a more adaptive manner.

42. Krista Duarte, LCSW, wrote in a letter dated March 9, 2020:

[B.B.] was enrolled at Eva Carlston Academy on February 19, 2021. Eva Carlston Academy is a licensed residential treatment center for adolescent females in Salt Lake City, Utah. [B.B.] was recommended to engage in ongoing residential treatment by her educational consultant, as well as by previous treatment providers following participation in a wilderness therapy program to allow [B.B.] to further stabilize and practice and implement skills acquired for emotional regulation.

At the time of intake, [B.B.] refused to cooperate and comply with parents and program staff. Throughout her intake she yelled, locked herself in a car, and ran away from staff and parents. Furthermore, she attempted to walk near a busy street which resulted in a restraint/hold to aid in emotional regulation and to address [B.B.]'s safety.

As a result of this erratic and dangerous behavior demonstrated by [B.B.] she requires ongoing consistent and vigilant supervision. This will be necessary in order to provide her a safe environment as she works on emotional regulation and impulse management, as well as to interrupt the negative behaviors and interactions which tend to manifest when [B.B.] is not well-supervised and/or emotionally dysregulated.

43. Kristie wrote that all B.B.'s treating professionals agreed that treatment in a residential program was necessary and appropriate. She stated that she was concerned that New Directions would attempt to supersede the opinions of the clinical professionals who had worked with B.B. on a firsthand basis and actively witnessed the deterioration of her conditions.

44. Kristie included copies of B.B.'s medical records with the appeal. These records showed that B.B. continued to struggle with symptoms which included anger issues, bullying, inability to maintain healthy relationships, poor judgment, anxiety, depression, feelings of worthlessness, panic attacks, thoughts of self-harm, suicidal ideation, and being placed on safety status for threatening others even while in a controlled treatment environment.

45. Kristie argued that New Directions was violating generally accepted standards of medical practice by using criteria which were functionally identical for both children and adults and that it was overemphasizing acuity and crisis stabilization rather than effective treatment. Kristie argued that Sunrise was the most cost-effective program for treating B.B. which would still allow her to receive safe and effective treatment and achieve meaningful gains.

46.  Kristie argued that New Directions also violated MHPAEA by having either no criteria or more permissive criteria for medical or surgical care and by denying B.B.'s non acute treatment needs based on acute level factors such as a risk of harm to self or others. She asked for a parity compliance analysis to be performed and to be provided with physical copies of the results of this analysis. She again asked for copies of the Plan Documents.

47. In a letter dated April 6, 2021, New Directions upheld the denial of payment for B.B.'s treatment. Despite being ostensibly conducted by a reviewer who had no prior

involvement in the process, the denial justification appears to have been largely copy and pasted from the previous denial letter and failed to note that it was Kristie, not Sunrise, who submitted the appeal. It stated in pertinent part:

> The Provider gave us clinical information that did not meet Medical Necessity according to our Medical Necessity Criteria for Psychiatric Residential Criteria. After reviewing New Directions' Medical Necessity Criteria that take into account age, progress of treatment, diagnosis and other programs available, we have determined your care can be provided in a less intensive level of care such as Psychiatric Outpatient.

> Solacium Sunrise asked for approval to provide care for you. You had support in your community. You did not have a medical condition that required this level of care. You were not thinking about harming anyone. You did not require residential care to keep safe. You were not at high risk to be hospitalized. You could continue your treatment in a less restrictive treatment setting. Please follow up with your care team for the next steps in your care.

### Outback

48. B.B. was admitted to Outback on December 18, 2020.

49. In a series of Explanation of Benefits statements BCBSKC denied payment under code TR0- "This service is not covered under the plan."

50. On September 13, 2021, Kristie submitted an appeal of the denial of payment for B.B.'s treatment. She asked BCBSKC to carefully review the information she provided and asked it to meaningfully respond to the arguments she made using appropriately qualified reviewers.

51. As she had with Trails, Kristie wrote that the Plan had a very detailed exclusions section which mentioned treatments like marital counseling, vocal cord training, or rolfing but made no mention of wilderness therapy as an excluded service.

52. She wrote that Outback was licensed and accredited and argued that B.B.'s treatment there should have been covered. She again expressed concern that denying payment for

outdoor behavioral health treatment despite no exclusion being present for these services likely constituted a violation of MHPAEA. She again asked BCBSKC to perform a MHPAEA compliance analysis on the Plan.

53. In a letter dated November 15, 2021, BCBSKC upheld the denial of payment for Outback. The letter stated that the reviewer had no record that the treatment at Outback was performed, prescribed, or ordered by a physician and that wilderness programs were not listed as a covered service. The reviewer wrote that no coverage was available for services not specifically covered under the insurance contract.

54. The letter also stated that the reviewer could find no record of any attempt at preauthorization and that MHPAEA was not applicable as wilderness care was not a covered service. Further, the reviewer stated that the Plan was a Kansas based organization and any Utah laws and regulations Kristie mentioned did not apply.

55. On March 4, 2022, Kristie submitted a level two appeal of the denial of payment of B.B.'s treatment. Kristie quoted the Covered Services provision of her benefits booklet which stated in pertinent part:

> Covered Services under the Contract are set forth in this section. All Covered Services are subject to Cost-Sharing requirements and the limitations and exclusions of the Contract.
>
> The specified services and supplies will be Covered Services only if they are:
>
> 1. Incurred for a Covered Person while coverage is effective;
> 2. Performed, prescribed or ordered by a Physician;
> 3. Medically Necessary for the treatment of Your injury or illness, except for specifically listed routine preventive or diagnostic services;
> 4. Not excluded under the Contract; and a Received in accordance with the requirements of the Contract.

56. Kristie wrote that BCBSKC denied payment in part due to the treatment not being performed, prescribed, or ordered by a physician but failed to account for the full

definition of a physician as defined in the benefits booklet, which defined the term

broadly to include "other practitioners of medical care and treatment when the services

performed are within the lawful scope of the practitioner's license and are provided

pursuant to applicable laws."

57. Kristie argued that when the term physician was defined properly, B.B.'s treatment

clearly qualified. She protested that BCBSKC had used the term "wilderness camp" to

describe Outback, equating it with boot camps and summer adventure camps, she argued

that it was clear from Outback's licensure and accreditation that these programs were

nothing alike.

58. She wrote that her benefits booklet stated that coverage was available for multiple

behavioral health services, including non-residential services. She stated that as Outback

met the requirements for coverage and was not listed as an excluded service, it should

have been covered.

59. She further stated that even in the event preauthorization was not obtained, the Plan

allowed for authorization of services in a variety of contexts, including reconsiderations

and retrospective review determinations.

60. She argued that despite its protests to the contrary, BCBSKC was violating MHPAEA by

imposing a non-quantitative treatment limitation on Outback based on facility type or

provider specialty. She again asked it to perform a MHPAEA compliance analysis and

again asked for a copy of the Plan Documents.

61. In a letter dated April 22, 2022, BCBSKC upheld the denial of payment for B.B.'s

treatment. The letter stated that coverage would remain denied due to a lack of

preauthorization, no coverage under the terms of the Plan, and MHPAEA being

considered inapplicable due to the denial basis being a coverage exclusion.

**ECA**

62. B.B. was admitted to ECA on February 19, 2021.

63. In an Explanation of Benefits statement dated November 2, 2021, BCBSKC denied

payment under code XAJ: "Authorization was not obtained therefore services are not

covered under the member's contract."

64. On March 4, 2022, Kristie submitted an appeal of the denial of payment for B.B.'s

treatment at ECA. Kristie stated that even in the event preauthorization was not obtained,

the Plan provided for a retrospective review to be conducted to allow the medical

necessity of treatment to be evaluated after the fact.

65. Kristie asked for a retrospective review to be performed and included a copy of B.B.'s

medical records with the appeal. She also asked for a copy of the Plan Documents and for

a MHPAEA compliance analysis to be performed.

66. In a letter dated March 31, 2022, New Directions denied payment for B.B.'s treatment.

The letter gave the following justification for the denial:

> We were unable to obtain from your provider the information necessary to
> approve the level of care requested. After reviewing New Directions' medical
> necessity coverage criteria for Psychiatric Residential Criteria that takes into
> account age, progress of treatment, diagnosis and other programs available, we
> have determined your care can be provided in a less intensive level of care such as
> Psychiatric Outpatient:
>
> Eva Carlson Academy asked for approval to provide care for you. Your care team
> provided us with information. You were treated for your mood and behavior. This
> level of care was not necessary to treat your condition. You were not a danger to
> yourself or others. Your thoughts were not severely impaired. You were able to
> take care of your daily needs.

67. On September 21, 2022, Kristie filed an appeal of B.B.'s denied payment at ECA. She reminded BCBSKC and its agent New Directions that they had an obligation to act in her best interest and asked them to carefully review her appeal in accordance with their obligations under ERISA.

68. She argued that New Directions had misapplied the criteria it had used to evaluate B.B.'s treatment and appeared to only be interested in stabilizing acute level symptoms like danger to self or others; she again alleged that this violated MHPAEA and asked for a parity analysis to be conducted.

69. Kristie included medical records and letters of medical necessity with the appeal. She argued that B.B.'s treatment was clearly medically necessary, clinically appropriate, and was provided in accordance with the terms and conditions of the Plan. Kristie pointed out that B.B. had an extensive history of treatment in other levels of care, and that her clinicians had recommended that she receive the residential treatment ECA provided. She again asked for a copy of the Plan Documents.

70. In response, Kristie received a letter dated October 4, 2022, where New Directions again upheld the denial of payment for B.B.'s treatment. Despite ostensibly being conducted by a new reviewer who was not involved in the previous denial, the letter was essentially identical to the previous March 31, 2022, denial letter with little to no substantive differences apart from recommending partial hospitalization instead of intensive outpatient care.

71. On January 20, 2023, Kristie asked for the denial of payment of B.B.'s treatment to be evaluated by an external review agency. She contended that BCBSKC had failed to abide

by its responsibilities under ERISA and had not meaningfully responded to any of the arguments she made or the evidence she provided.

72. Kristie wrote that she had not been provided with the documentation she requested and that she was uncertain whether BCBSKC had even read her appeal, as the October 4, 2022, denial and the March 31, 2022, denial were nearly identical and made the same conclusory statements. Kristie included a side-by-side comparison to illustrate the near identical nature of the letters.

73. She pointed out that the letters did recommend different levels of care but were otherwise essentially indistinguishable. She argued that they made vague sweeping statements such as "this level of care was not necessary to treat your condition" without making any attempt to justify why this was the case, that they did not engage with her arguments in any meaningful capacity and gave no indication that the reviewer was qualified to assess the case in the first place.

74. Kristie asked for the external reviewer to correct these shortcomings and asked the external reviewer to fully address her arguments and not "blindly appl[y] acute standards" to B.B.'s sub-acute treatment as BCBSKC had done.

75. In a letter dated March 20, 2023, external reviewer KFMC upheld the denial of payment for B.B.'s treatment. The reviewer specifically referenced a lack of "evidence or indication of acute psychiatric symptomology, risks of harm to self or others, or significant or emotional and behavioral health conditions" to support their rationale for denying payment.

76. The reviewer stated that while B.B.'s treatment team had recommended residential care, the lack of "acute psychiatric symptomology or behaviors that would be considered

dangerous to the member or to others" meant that continued treatment at the residential level was not indicated. Further, the reviewer opined that the treatment was for B.B.'s convenience, not consistent with the least restrictive setting restricted to the "shortest possible intervals," nor was it the most cost effective treatment that could have been provided, and the records did not "support the presence of acute psychiatric conditions or ongoing behavioral problems that would warrant an increase in the level of care at a residential facility."

77. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

78. The denial of benefits for B.B.'s treatment was a breach of contract and caused Kristie to incur medical expenses that should have been paid by the Plan in an amount totaling over $290,000.

### <u>FIRST CAUSE OF ACTION</u>

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

79. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BCBSKC, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

80. BCBSKC and the Plan failed to provide coverage for B.B.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

81. ERISA also underscores the particular importance of accurate claims processing and

evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

82. BCBSKC and the agents of the Plan breached their fiduciary duties to B.B. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in B.B.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of B.B.'s claims.

83. BCBSKC and New Directions made little effort to meaningfully respond to the allegations raised in Kristie's appeals. In fact, in multiple instances the Defendants appear to have copied and pasted the same language despite claiming in their letters that each denial was evaluated by a new reviewer.

84. As neither BCBSKC nor New Directions identified their reviewers in their letters, this statement is impossible to verify, nor can the reviewers' qualifications be readily assessed.

85. The actions of BCBSKC and the Plan in failing to provide coverage for B.B.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

86. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

//

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

87. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BCBSKC's fiduciary duties.

88. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

89. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

90. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

91. The Congressional purposes in passing MHPAEA are separate and distinct from the Congressional purposes in passing ERISA. Similarly, the enforcement mechanism for violations of MHPAEA by Plan participants and beneficiaries are different from the

enforcement mechanisms participants and beneficiaries have for wrongful denial of plan benefits.

92. The criteria used by BCBSKC for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

93. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for B.B.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

94. When BCBSKC and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

95. BCBSKC and the Plan evaluated B.B.'s mental health claims using criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

96. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, BCBSKC's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that B.B. received. BCBSKC's improper use of acute inpatient medical necessity criteria is revealed in the statements in BCBSKC's denial letters such as "You were not a danger to yourself or others."

97. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that B.B. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

98. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

99. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

100. In addition, the level of care applied by BCBSKC failed to take into consideration the patient's safety if she returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

101. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

102. Kristie noted that BCBSKC restricted the availability of B.B.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. Kristie argued

that not only did BCBSKC exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. Kristie requested to be provided with these criteria if they existed, but BCBSKC ignored this request.

103. Further, regarding the outdoor behavioral health treatment B.B. received, the National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

104. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by BCBSKC.

105. BCBSKC also declined to pay for B.B.'s outdoor behavioral health treatment despite no exclusion for the service being present in the terms of the Plan and coverage being available. BCBSKS does not similarly restrict coverage for analogous medical or surgical facilities.

106. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BCBSKC, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

107. BCBSKC and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any

substantive capacity the Plaintiffs' allegations that BCBSKC and the Plan were not in compliance with MHPAEA.

108.     BCBSKC and New Directions stated that MHPAEA was not applicable due to the services not being covered, but this is a misapprehension of the statute. MHPAEA applies when mental health care is put to a more rigorous standard than its medical or surgical analogues. Plaintiffs allege that coverage is and was available, but even if it were not, Defendants are and would be subject to MHPAEA.

109.     The violations of MHPAEA by BCBSKC and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

110.    In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1.    Judgment in the total amount that is owed for B.B.'s medically necessary treatment at Trails, Sunrise, Outback, and ECA under the terms of the Plan, along with her crisis transportation plus pre and post-judgment interest to the date of payment;

2.    Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.    Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.    For such further relief as the Court deems just and proper.

DATED this 2nd day of June, 2025.

By     s/ Brian S. King
                Brian S. King
                Attorney for Plaintiff

County of Plaintiff's Residence:
Johnson County, Kansas.